**UNITED STATES of America,**

v.

**Hector MANUEL RAMOS and Nelson Moreno, Defendants.**

**No. 03 Cr. 724(GEL).**

United States District Court,
S.D. New York.

June 30, 2004.

be entirely satisfactory, for the rights in question cannot all be fully protected without sacrifice of at least some aspect of the conflicting rights. Nevertheless, with considerable reluctance, the government's motion will be granted.

Helen Cantwell, Assistant United States Attorney, New York, N.Y. (David N. Kelly, United States Attorney for the Southern District of New York), for the United States of America.

Valerie S. Amsterdam, New York, NY, for Defendant Hector Manuel Ramos.

## OPINION AND ORDER

LYNCH, District Judge.

The dilemma presented in this case is a familiar one, though it is here posed in the most intense circumstances. In protecting the right of criminal defendants to counsel, courts have conflicting duties, on the one hand, to guarantee effective assistance of counsel, police the rules governing the legal profession, and preserve the appearance and reality of fairness in the criminal process, and, on the other, to protect a defendant's right to counsel of choice, and avoid the appearance or reality of government imposition on the attorney-client relationship. The difficulty in balancing those conflicting duties is heightened in a capital case where a defendant's very life is on the line, and where defense counsel represents the defendant's only bulwark against the federal government, which holds the power to determine whether to seek the ultimate penalty. The government in this case seeks to disqualify an attorney over defendant's explicit objections. No resolution of this dilemma will

## BACKGROUND

Hector Manuel Ramos (along with a co-defendant, Nelson Moreno, who is not involved in the present motion) is charged in the instant seven-count indictment with one count of murder for hire conspiracy, 18 U.S.C. § 1958, and four counts of murder in furtherance of a continuing criminal enterprise, 21 U.S.C. § 848(a), (c), (e), & (A)(1), as well as use of a firearm in relation to a crime of violence, 18 U.S.C. § 924(c), and narcotics conspiracy, 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(c).[1] Violations of 18 U.S.C. § 1958 and 21 U.S.C. § 848(e) each carry the potential penalty of death.

As is often the case in potential capital cases, judicial proceedings have been stalled while the parties pursue the time-consuming administrative process by which the Department of Justice decides whether the ultimate punishment will actually be sought. See 9 United States Attorneys' Manual ("USAM") § 10.000 et seq. Understandably choosing to actively attempt to influence the all-important exercise of prosecutorial discretion, defense counsel in capital cases often join with the government in effectively staying the usual criminal procedure of filing motions and preparing for trial on the merits, and instead choose to pursue an investigation into potential mitigating circumstances, the results of which will be presented first to the United States Attorney and then to

---

1. Defendant is also charged in Counts 2–6 under 18 U.S.C. § 2, which allows the government to charge as a principal anyone who "willfully causes … to be done" or "aids, abets, counsels, commands, induces or procures [the] commission" of a federal crime.

the Department of Justice in Washington in an effort to persuade prosecutors not to seek the death penalty. *See id.* Due to the commendable efforts of Congress and of the Department of Justice to ensure—to whatever extent such assurance is possible to flawed human judgment in a fallen world—that this awesome decision is made equitably and after full deliberation, this process is lengthy and expensive. Although the original indictment in this case was filed on June 5, 2003, from a procedural standpoint the case remains in its earliest stages, with pretrial discovery and defense investigation ongoing. So far as the Court is aware, the defense has not presented its argument for life to the United States Attorney, the United States Attorney has not determined what he will recommend to the Attorney General, and, it follows, the government as a whole has not decided whether to endeavor to persuade a jury to have the defendants killed.

Throughout this long ordeal, from his first arrest on a complaint on May 23, 2003, Ramos (who is indigent) has been represented by Valerie S. Amsterdam, a member of the Court's Criminal Justice Act ("CJA") panel. Amsterdam, an attorney with over 25 years of experience at the criminal bar, is well known to this Court as an extremely capable and zealous defense attorney. Although Amsterdam was appointed by the Magistrate Judge by the usual process of random assignment, as it happens she is one of only approximately 20 attorneys in this district who have been certified by the Court as qualified to handle capital cases. Moreover, the Court has observed that, even among the ranks of determined defenders, Amsterdam stands out for her dedication to her clients, and her success in achieving a personal rapport with them. In this case, Amsterdam represents that she has spent countless hours investigating the complex allegations, counseling her client, and developing a

strategy for his defense. (Letter to the Court from Valerie S. Amsterdam of June 18, 2004 ("Amsterdam Letter 6/18/04"), at 10.) From everything the Court has been able to observe, there is no reason to doubt that representation.

Early in the case, as authorized by the statute governing federal death-eligible offenses, 21 U.S.C. § 848(q)(4)-(7), the Court acceded to Ramos's request to appoint a second attorney, John H. Jacobs, to assist in the capital defense. Ramos, through Amsterdam, particularly sought the appointment of Jacobs, a friend and colleague of Amsterdam's who had worked with her before. The Court granted that application, in significant part because of the advantages of constituting a defense team that could work effectively together. The team promptly set to work reviewing discovery materials and conducting independent investigation in aid of Ramos's intended presentation to the government.

On January 20, 2004, the Court received the first indication that all was not well with the defense team. On that date, the government advised the Court that Amsterdam and Jacobs were under criminal investigation by the United States Attorney for the Eastern District of New York. As it is obligated to do, in order to protect a defendant's right to counsel, *see United States v. Curcio,* 680 F.2d 881 (2d Cir. 1982), the Court then conducted a careful inquiry of the defendant on February 2, 2004. During that inquiry, the Court advised Ramos of the risks of proceeding with attorneys who might have a conflict of interest, in that they were being investigated by the same Department of Justice (albeit a different unit in an adjoining judicial district) that was prosecuting him. (2/2/04 Tr. at 8–11.) After a lengthy colloquy, the Court offered, and Ramos accepted, the services (at government expense under the CJA) of an independent attor-

ney, Stephen Guarneri, to advise him on the advantages and disadvantages of seeking new counsel. (*Id.* at 11–16.) The Court gave Ramos three days to consider his options.

After consulting with his attorneys and with Guarneri, and reflecting on his best course of action, Ramos elected to waive any conflict and continue to be represented by Amsterdam and Jacobs. (2/5/04 Tr. at 4–6.) Having observed Ramos throughout this and other conferences, the Court has no doubt that Ramos made this decision intelligently and with as much information and counsel as the Court and counsel could provide. (*See id.* at 5–6.)

The defense proceeded with its investigations. Apparently, however, so did the prosecutors in the Eastern District, and on April 22, 2004, Amsterdam was indicted on five counts. All of the charges arise from alleged acts in the course of her practice of criminal defense, and counts one through four in particular stem from her handling of CJA appointments. These charges are all related to the central allegation that she accepted payment from a client she had been appointed to represent under the CJA, and that she subsequently lied about the payment to the court, to prosecutors and to law enforcement officers. Amsterdam, of course, is presumed innocent of these charges, and vehemently protests her innocence. (*See* 1/28/04 Tr. at 9; Amsterdam Letter 6/18/04 at 2.) The government advised the Court of this indictment on May 4, 2004, moving for Amsterdam's disqualification. (Letter to the Court from Assistant United States Attorney Helen Cantwell of May 4, 2004.) The Court

called the parties together for a conference on May 6, 2004.

The conference had certain extraordinary aspects. Among other things, the Court received communications not only from the defendants and their attorneys, but also from criminal defense attorneys representing each of Ramos's attorneys. The government represented that, due to the nature of certain allegations in her indictment, Amsterdam was banned by the Bureau of Prisons from the detention facility in which Ramos was being held, and thus effectively precluded from consulting with her client in person. Her attorney, Elkan Abramowitz, wrote to the Court to express confidence that, as a result of his intervention, this prohibition would soon be rescinded. (Letter to the Court from Elkan Abramowitz of May 5, 2004.) Meanwhile, Jacobs notified the Court that, on the advice of his attorney, Gerald Shargel, Jacobs would not appear in the same courtroom with Amsterdam, as a consequence of the ongoing proceedings in the Eastern District.[2] And indeed, at the conference, Jacobs did not appear, although an associate appeared on his behalf. (5/6/04 Tr. at 5.) Amsterdam advised the Court that she had not yet had the opportunity to consult with her client about these developments, but that she was "emotionally, professionally, and ... financially" interested in remaining on the case (*id.* at 28), and that out of "deep loyalty to Mr. Ramos" she was committed to letting him make the decision about future representation (*id.* at 27).

The Court directed that Ramos be afforded an opportunity to confer separately with Amsterdam, Jacobs, and Guarneri,

**2.** Both the government and Amsterdam (Letter to the Court from Assistant United States Attorney Daniel M. Gitner of May 26, 2004, at 3–4; 5/6/04 Tr. at 28) represent that Jacobs is the attorney referred to in the indictment as

John Doe, and that he allegedly played some role in the events that form the subject of at least some part of the Eastern District indictment.

and directed counsel to notify Guarneri of the renewed need for his services. (*Id.* at 30–33.) The Court made clear that while it was up to Ramos to consider, in light of all these events, whether he preferred to change either or both of his present counsel, Jacobs would have to appear at the next conference if he was to remain on the case. (*Id.* 33–35.)

On May 21, 2004, Amsterdam informed the Court that Ramos did not consent to her removal from the case, but had decided to discharge Jacobs. (Letter to the Court from Valerie S. Amsterdam of May 21, 2004.) The government then alerted the Court that, contrary to the Court's instructions, Guarneri had not been notified of the need for his services; it further claimed that Jacobs had represented in an earlier conversation with the assistant United States Attorney that Ramos did not want Jacobs discharged. (*See* to the Court from Assistant United States Attorney Daniel Gitner of May 26, 2004, at 3–4.) At a subsequent conference on May 27, Jacobs again declined to appear, after providing conflicting advice to the Court as to whether or not he would attend the conference. (*See* s to the Court from John Jacobs of May 26, 2004, by facsimile, 10:16 a.m. and 4:13 p.m.) Upon the defendant's confirmation that he wished to discharge Jacobs, the Court removed Jacobs from the case and appointed Jeremy Schneider, another member of the Court's capital defender panel, as co-counsel, to assure continuity of counsel.[3] (5/27/04 Tr. at 12–15.) The Court emphasized to Ramos that should Amsterdam be convicted, she might not be able to continue to represent him. (*Id.* at 10–12.) Once again the Court urged Ramos to consult with Guarneri, but

scheduled briefing on the government's motion to disqualify Amsterdam in the event that the defendant should choose to continue with her. (*Id.* at 14–18.)

Both sides have submitted briefs, and the matter is now ripe for decision.

## DISCUSSION

The government advances two related but distinct arguments for disqualifying Amsterdam despite the wishes of her client. First, the government argues that the conflict of interest between Amsterdam and her client is unwaivable, that is, that no reasonable defendant would decline to waive the conflict under these circumstances, and that his waiver is therefore ineffective. Second, it contends that Amsterdam should be disqualified pursuant to the Court's independent obligation to ensure the appearance and reality of fair proceedings. Though intertwined, the arguments focus primarily on different interests. The first argument emphasizes the need to protect Ramos, despite himself if necessary, from the risks to him posed by an attorney conflict of interest. The second emphasizes instead the importance, regardless of whether Ramos's own interest can be protected, of ensuring public respect for and confidence in the fairness of legal processes.

## I. Unwaivable Conflict

The government's first argument begins from an unquestionable premise. As the Second Circuit has held on numerous occasions, a defense lawyer who is under investigation or indictment has a potential conflict of interest with his client. *Armienti v. United States,* 234 F.3d 820 (2d Cir. 2000), is typical. In that case, Armienti's

---

**3.** Ramos expressly advised the Court at the May 27 conference that he wished to discharge Jacobs. (5/27/04 Tr. at 13–14.) In any event, in view of Jacobs' repeated failure,

on advice of counsel, not to appear, his continued participation in the case was clearly impossible.

lawyer was being criminally investigated by the same United States Attorney's office that was prosecuting him. The Court of Appeals noted that this fact "present[ed] a plausible claim that his lawyer had an actual conflict of interest." *Id.* at 824. The Court listed several ways in which the lawyer's problems could have impacted on his representation of Armienti, including "failure to conduct further investigation, failure to vigorously cross-examine the government's witnesses, and failure to make various objections," as well as the possibility that "the lawyer's own criminal investigation caused him to devote less time to his representation of Armienti and to be ill-prepared and distracted at trial." *Id.* at 825. Such deficiencies could be the product of conflict of interest because "[a] lawyer in these circumstances, while dealing on behalf of his client with the office that is prosecuting him personally may, consciously or otherwise, seek the

goodwill of the office for his own benefit," and seeking prosecutorial goodwill "may not always be in the best interest of the lawyer's client." *Id.* The Court of Appeals has dealt with post-trial allegations of such conflicts on numerous occasions. *See, e.g., Triana v. United States,* 205 F.3d 36 (2d Cir.2000); *United States v. Eisen,* 974 F.2d 246, 264–66 (2d Cir.1992); *United States v. Aiello,* 900 F.2d 528, 530–32 (2d Cir.1990).[4] Where an attorney is under indictment and being prosecuted by the same office that is prosecuting his client, the Court has held, the lawyer "may have believed he had an interest in tempering his defense of [the client] in order to curry favor with the prosecution, perhaps fearing that a spirited defense of [the client] would prompt the Government to pursue the case against [the attorney] with greater vigor." *United States v. Levy,* 25 F.3d 146, 156 (2d Cir.1994).[5]

4. In most of the cases in which the Second Circuit has faced this problem, the lawyer was being investigated or prosecuted by the same office that was prosecuting the client, in contrast to the present case, where the prosecutions are in separate districts. Obviously, the former scenario intensifies the risk of "currying favor" cited by the Court. But the fact that the prosecutions here are in different districts does little to mitigate the conflict. First, under Justice Department procedures, the critical decision whether to seek the death penalty is made centrally, not by the individual United States Attorneys. *See* 9 USAM § 10.000 *et seq.* Thus, it cannot be said that Ramos is being prosecuted simply by the United States Attorney for the Southern District of New York, rather than by the same Department of Justice that supervises the prosecutors pursuing Amsterdam. *See* 9 USAM § 2.032 (requiring prior notification of the Department of Justice in prosecutions of attorneys where "(i) the charges are based, in whole or in part, on actions or omissions by the attorney during the representation of a current or former client; and (ii) the attorney's current or former client is, or is likely to be, a witness against the attorney; and (iii) the client will, or is likely to, testify against

the attorney pursuant to a nonprosecution, cooperation, or similar agreement with the government."). Second, this is not a case in which the lawyer is indicted by some other sovereign, or by a distant outpost of the federal government. The federal prosecutors involved in these cases may be in different judicial districts, but the districts in question are the only two in the country that are located in the same city, indeed, only about a mile apart. While anyone familiar with the distinguished histories of these two United States Attorneys' Offices knows that their relationship has been characterized by rivalry as much as cooperation, it is (and surely would appear to the public) unrealistic to maintain that these prosecutions are being mounted by entirely distinct and independent entities, or that the kinds of conflicts noted by the Second Circuit are much mitigated by the fact that the two sets of prosecutors are located on opposite sides of the Brooklyn Bridge.

5. Other appellate courts have reached similar conclusions. *See, e.g., Thompkins v. Cohen,* 965 F.2d 330, 332 (7th Cir.1992) (noting that a conflict can arise when a defendant's lawyer is himself involved in separate criminal investigation by the same prosecutor's office);

Because these cases for the most part arise as post-trial challenges to convictions, they are principally concerned with the question of when such conflicts require reversal of convictions. Thus, in very limited circumstances, such as when a lawyer is implicated in the very crimes charged against his client, the Second Circuit has held that a *per se* conflict is present, in which no prejudice need be shown. *United States v. Cancilla,* 725 F.2d 867, 869–71 (2d Cir.1984); *see also United States v. Fulton,* 5 F.3d 605, 611–12 (2d Cir.1993) (*per se* conflict existed where government witness testified to defense counsel's involvement in criminal activity related to charges against client).[6] In other cases where a lawyer is under investigation or indictment, the Court has insisted upon proof of actual adverse impact on the representation before reversing a conviction. *See, e.g., Armienti,* 234 F.3d at 823–25. But whatever the standard for reversing a conviction, the Court has never wavered from considering the lawyer's position as a target of criminal investigation while representing a criminal defendant a situation of conflict of loyalties analogous to representation of multiple clients: "What could be more of a conflict than a concern over getting oneself into trouble with criminal law enforcement authorities?" *Cancilla,* 725 F.2d at 870.

These decisions are of limited help to a court confronting a disqualification motion. The decision *after* a trial whether a lawyer's potential or actual conflict requires reversal or vacation of a conviction is much different than the decision *before* trial whether to permit a lawyer to proceed with a representation. The cases do, however, strongly intimate that the present conflict is not unwaivable.

The Second Circuit has recently emphasized that the category of unwaivable conflicts of interest is a "very narrow" one. *United States v. Perez,* 325 F.3d 115, 126 (2d Cir.2003). The conclusion that a conflict is unwaivable requires reversal of a conviction even though the defendant was fully advised of the conflict and its consequences, and consciously decided to take the risk of proceeding with conflicted counsel. *See United States v. Schwarz,* 283 F.3d 76, 95–97 (2d Cir.2002). This means that "counsel has an actual conflict that is so severe as to indicate *per se* that the rendering of effective assistance will be impeded." *Perez,* 325 F.3d at 125. If the existence of a criminal investigation or indictment of counsel for alleged misconduct unrelated to the pending case constituted such a severe, *per se* impediment to effective assistance, the Court of Appeals presumably would not have been able to determine, in many of the cases involving similar conflicts, that effective assistance had nevertheless been provided, or at least that the trial court needed to conduct an inquiry to determine whether the effectiveness of counsel had been compromised. *See, e.g., Aiello,* 900 F.2d at 531–34 (find-

---

United States v. McLain, 823 F.2d 1457, 1463–64 (11th Cir.1987), *recognized as overruled on other grounds in United States v. Watson,* 866 F.2d 381, 385 n. 3 (11th Cir.1989) (finding actual conflict when defendant's counsel under investigation for bribery by same U.S. Attorney's Office prosecuting defendant).

**6.** The Court has been slow to extend this rule, *Waterhouse v. Rodriguez,* 848 F.2d 375 (2d Cir.1988) (attorney facing disbarment), and it has not been unanimously favored by other courts. *See, e.g., Cerro v. United States,* 872 F.2d 780, 784–86 (7th Cir.1989) (declining to adopt Second Circuit *per se* rule even where defense counsel was implicated in crime related to charges against defendant because on the facts, "the evil that the Second Circuit sought to avoid—a defense attorney ineffectively representing his client because the authorities might become aware of the attorney's own criminal misconduct—is not present").

ing no *per se* conflict where investigation of defense counsel concerned crime "totally unrelated to the narcotics and tax crimes for which [the defendant] was being tried"); *Armienti,* 234 F.3d at 823–25 (remanding to trial court for effectiveness inquiry). *See also United States v. Jones,* 900 F.2d 512, 519 (2d Cir.1990) (finding that prosecutorial threat of investigating defense counsel did not raise *per se* conflict); *Waterhouse v. Rodriguez,* 848 F.2d 375 (2d Cir.1988), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 564, 107 L.Ed.2d 558 (1989) (no *per se* conflict when defense counsel faced disbarment proceedings).

■ In *Perez,* the Court emphasized that "[w]here the right to counsel of choice conflicts with the right to an attorney of undivided loyalty, the choice as to which right is to take precedence must generally be left to the defendant and not be dictated by the government." 325 F.3d at 125. Where the trial court determines that the attorney labors under only a potential conflict or a less than a *per se* prejudicial actual conflict, then it *"may* accept a defendant's knowing and intelligent waiver of his right to conflict-free counsel and permit the defendant to be represented by the attorney of his choice." *Id.* (emphasis added). In reviewing the cases in which it had found a conflict unwaivable, the Court reiterated language in those cases finding that the conflict could not be waived because "no rational defendant" would have waived the conflict. *See id.* at 126 (quoting *Fulton,* 5 F.3d at 613); *id.* at 127 (quoting *Schwarz,* 283 F.3d at 96). The Court has used that standard in defining when a conflict is unwaivable. *Levy,* 25 F.3d at 153 ("If the court discovers that the attorney suffers from a severe conflict—such that no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation—the

court is obliged to disqualify the attorney.").

■ As Judge Raggi pointed out in a separate opinion in *Perez,* the "no rational defendant" standard is difficult to apply in circumstances (as in *Schwarz,* or in the instant case) in which a perfectly rational defendant, "after a flawless *Curcio* inquiry," has indeed elected to waive the conflict. 325 F.3d at 132–33 (Raggi, J., concurring). At least three arguments, however, support the view that the present conflict is not an "unwaivable" one that requires disqualification of counsel as a matter of law.

First, as noted above, the Second Circuit has not treated the existence of a criminal investigation or indictment on unrelated charges as constituting a conflict that presents a *per se* finding of ineffectiveness. Rather, in cases presenting that problem, the Court has conducted or mandated a careful inquiry to determine whether the conflict did in fact affect the representation. *See, e.g., Armienti,* 234 F.3d at 823–25; *Aiello,* 900 F.2d at 531–34. This strongly suggests that the fact that a lawyer faces unrelated criminal charges does not automatically compel the inference that the lawyer is incapable of providing effective counsel to a criminal defendant. Indeed, in *Levy* itself, the Court did not find a *per se* prejudicial, unwaivable conflict where the defense lawyer was not only a defendant in another unrelated criminal case, but had also represented a co-defendant, was a suspect in that co-defendant's flight from the jurisdiction, and was a potential witness in the case. Instead, it reversed the conviction because the client had not knowingly and intelligently waived the conflict. 25 F.3d at 158–59.

Second, following Judge Raggi's advice that the best way to analyze the problem is to "focus on identifying those narrow cir-

cumstances" in which "even a rational defendant cannot be permitted to offer a knowing and intelligent waiver," 325 F.3d at 133, the cases in which the Court *has* found an unwaivable conflict are easily distinguishable. In *Fulton*, as already noted, the government's evidence implicated defense counsel in the very crime being charged, such that "[c]ounsel's judgments about potential defense strategies [could have been] affected by the fear that evidence concerning counsel's involvement might come out." 5 F.3d at 613. Such a fear could lead the lawyer to avoid counseling the client to plead guilty and cooperate, to limit his cross-examination of witnesses, and to discourage the client from testifying. *Id.* The conflict thus "permeates the defense," affecting "virtually every aspect of his or her representation of the defendant." *Id.* In *Schwarz*, as the Court of Appeals perceived the situation, counsel had a financial and ethical interest in representing the institutional interests of the Policeman's Benevolent Association ("PBA"), a constituency that had fundamentally different interests in the case than those of the defendant client. 283 F.3d at 96. The conflict was therefore so severe as to raise the possibility that "at each point the conflict was felt, [counsel] would sacrifice Schwarz's interests for those of the PBA." *Id.* Nothing of the sort appears here.

Third, applying the "no rational defendant" standard, it seems that a rational defendant might well choose to stick with Amsterdam under these circumstances. As noted above, Amsterdam is a conscientious, experienced and effective defense lawyer who has a good relationship with her client and a deep knowledge of the case, developed over a year's work. In a matter that is already proceeding slowly, with the defendants imprisoned for over a year, replacement counsel will take considerable time to get up to speed on this complex case. While courts have identified the risk that a lawyer who is under indictment will have an incentive to curry favor with the government, *Levy*, 25 F.3d at 156; *Thompkins*, 965 F.2d at 332, it is hardly a foregone conclusion or fact of human nature that this will occur. Unlike the case in which a lawyer is arguably implicated in the very misconduct charged in the case, Amsterdam would not need to fear that tactical decisions at trial could lead to the development of further evidence against her. A vigorous defense of Ramos would not lead to a rational concern that evidence damaging to Amsterdam would result.[7] As for the pure concern with currying favor, a rational defendant might well conclude that an attorney who is already indicted has little to gain from the government by throwing his case. This is particularly so because the likelihood that the lawyer would do such a thing depends on his or her individual character and temperament, something a client of a year's duration is in a position to evaluate. A rational client could decide that there is little or no risk of this particular lawyer's succumbing to that particular temptation.

While the matter cannot be completely free from doubt, it appears that a fully knowing and intelligent waiver could be effective in preventing a later reversal of

---

**7.** The government suggests that Amsterdam could fear that cooperation by Ramos could lead to further evidence against her. That claim is, at best, speculative and unsubstantiated. First, there is no hint of any evidence that Amsterdam was guilty of any impropriety in connection with Ramos that could make his cooperation a threat to her in her entirely unrelated case. Second, it is far-fetched to suggest that the government would seek the cooperation of Ramos, who is charged with four murders, in order to use him as a witness to uncharged other crimes in a prosecution of a lawyer for professional misconduct.

any conviction on the ground that counsel labored under an unwaivable, *per se* prejudicial conflict of interest.

## II. Integrity of the Process

■ This does not end the inquiry, however. That a conflict is potentially waivable may mean that the Court is not *required* to disqualify counsel, but it does not mandate that such a waiver be accepted. "A district court has 'substantial latitude' to require disqualification even where defendants have attempted to waive any potential conflict." *United States v. Zichettello,* 208 F.3d 72, 104 (2d Cir.2000), quoting *Wheat v. United States,* 486 U.S. 153, 163, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). In *Zichettello,* the Court upheld a disqualification where the "district court had an ample basis on which to conclude that the conflicts ... were severe and hence disqualification was necessary." *Id.* And *Wheat,* the Supreme Court decision on which *Zichettello* relies, compels the conclusion that the trial court's discretion to disqualify conflicted counsel is not limited to such situations.

In *Wheat,* the Court faced a fairly routine multiple representation scenario. The attorney in question had already represented two defendants charged with participating in the same drug conspiracy with defendant Wheat. One defendant, Bravo, had already pled guilty. Another defendant, Gomez–Barajas, had been acquitted of the drug conspiracy, but had offered to plead guilty to certain other charges, although the Court had not yet finally accepted the plea. Neither had apparently agreed to cooperate with the government. When Wheat sought to retain their lawyer for his impending trial, a potential conflict existed because of the possibility that the government would call Bravo at Wheat's trial (and the considerably more speculative possibility that Gomez–Barajas might

withdraw his plea, at which point the government might call Wheat to testify against him). 486 U.S. at 155–56, 108 S.Ct. 1692. As Wheat argued, and as the four dissenting justices pointed out, the defendants' offer to waive these conflicts hardly appeared irrational. Bravo maintained that he did not know Wheat and could not testify against him, and the remaining charges against Gomez–Barajas were not ones in which Wheat was implicated, making Wheat's presence as a witness unlikely even in the speculative event that Gomez–Barajas should withdraw his plea. *Id.* at 156–57, 108 S.Ct. 1692; *see also id.* at 169–71, 108 S.Ct. 1692 (Marshall, J., dissenting); *id.* at 172, 108 S.Ct. 1692 (Stevens, J., dissenting).

It thus would seem unlikely that the Supreme Court considered these to be "severe" conflicts that were arguably within the narrow class of conflicts as to which a waiver would never be adequate, and indeed, the Court did not make any such finding. Rather, the Court found that the district court's refusal to permit the lawyer to represent Wheat was "within its discretion." *Id.* at 164, 108 S.Ct. 1692. This was not because Wheat's right to effective assistance of counsel could only be protected by disqualification. Rather, the Court emphasized a different interest: "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160, 108 S.Ct. 1692. At stake was "[n]ot only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases." *Id.*

There can be no question that a lawyer laboring under a conflict is at a disadvantage. The client has a right to unconflicted representation, and conflicted counsel is only authorized, if at all, where the client

enters a waiver of some aspect of his right to an effective defense. The Supreme Court held, however, that courts are not compelled to accept a waiver of unconflicted loyalty, even where that is what a defendant might prefer. Instead, the Court ruled that "where a court justifiably finds an actual conflict of interest, *there can be no doubt* that it may decline a proffer of waiver." *Id.* at 162, 108 S.Ct. 1692 (emphasis added). In light of the uncertainty of gauging in advance the likely impact of potential conflicts, when trial courts, lacking the hindsight brought to the analysis by appellate panels after the fact, must decide disqualification motions, the Court concluded that "the district court must be allowed substantial latitude in refusing waivers of conflict of interest *not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.*" *Id.* at 163, 108 S.Ct. 1692 (emphasis added).

■ Thus, "there can be no doubt" that this Court has discretion to grant the government's motion even in the absence of a demonstrated actual conflict, let alone a conflict so severe that accepting a waiver would be error. *Id.* at 162, 108 S.Ct. 1692. The Court "must recognize a presumption in favor of petitioner's counsel of choice," but that presumption may be overcome where there is a "serious potential for conflict" that would jeopardize the interests in ethical practice and the appearance of fairness identified by the Supreme Court in *Wheat.* *Id.* at 164, 108 S.Ct. 1692.

■ Applying these standards, this Court has a firm confidence—albeit one reached with great regret, and after allowing great weight to the presumption against disqualification—that disqualification is appropriate under the circumstances of this case. Several factors bear on this decision. First, there can be no doubt that Amsterdam's criminal indictment poses obstacles to unconflicted and effective representation. As pointed out above, the Court cannot, at this time, conclude that these obstacles are so severe that the conflict of interest is unwaivable such that disqualification is mandatory. But they are none the less real. The psychological impact of facing indictment will surely vary between individuals. The Court's private view is that Amsterdam is very unlikely to be motivated to curry favor with the government by pulling punches in this case, both because it would be clear to her that the government would certainly not appreciate or reward any such behavior, and because that does not appear to be within her personality. But the subtlety of subconscious influence cannot be ruled out. Such influence, moreover, can operate in various, potentially contradictory ways. A lawyer angry at the government for what she regards as unjustified charges could be moved to excessive aggression in defense, or a lawyer fearful of appearing to pull punches might lean toward such aggression.[8]

The canons of the profession counsel against conflicts because "[t]he professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of

---

8. At the May 6 conference, for example, Amsterdam rejected the idea that she would "curry favor with the Government" as "ludicrous," stating that "I would rather kill the Government than curry favor with the Government." (5/6/04 Tr. at 25.) As the Court noted at the time (*id.* at 40), this was "only a manner of speaking," but it is revealing of the kind of emotional intensity, unrelated to the interests of the client Ramos, that could interfere with Amsterdam's exercise of professional judgment.

compromising influences and loyalties." American Bar Association, Model Code of Professional Responsibility, Ethical Consideration ("EC") 5–1. "A lawyer should not accept proffered employment if his personal interests of desires will, or there is a reasonable possibility that they will, affect adversely the advice to be given or services to be rendered to the prospective client." *Id.*, EC 5–2. The technical rules governing conflicts of interest are all essentially elaborations on the theme that the client is entitled to the lawyer's "independent professional judgment." *Id.*, Canon 5. Any tangible influence or emotional involvement that can have the effect of impeding the detached exercise of professional judgment presents a danger of potential conflict. The Court has already had occasion to note the extreme emotional intensity of the conferences at which the issue of Amsterdam's indictment and potential disqualification have been discussed. (5/6/04 Tr. at 39–40.) Cool professional detachment under such circumstances cannot be guaranteed, nor can the Court (or, for that matter, counsel herself) predict the potential subconscious influences on strategic decisions of client counseling as a result of these unusual and threatening circumstances.

Second, the indictment of Amsterdam has already adversely impacted the representation of Ramos. Like any defendants charged with a potentially capital crime, Ramos was entitled to, and received, the appointment of additional counsel, John Jacobs. Jacobs was appointed at the specific request of Amsterdam, on her recommendation that he would be able to work well with her and complement her skills. Nevertheless, the criminal investigation, and the resulting indictment of Amsterdam but not of Jacobs, has led to the breakdown of relations between counsel, the apparent abandonment of the representation by Jacobs, and his eventual re-placement at the request of Ramos. The Court has no desire to explore the mechanisms of this breakdown, but it is manifest that the falling out between counsel had nothing to do with professional disagreements about how best to advance Ramos's interests, but rather resulted from the strain of the investigation and the divergent interests of attorneys who were subject to investigation. This is perfectly understandable, and there is no need to assess blame, but the compromise to the effectiveness of the team, and the need to appoint a new lawyer to replace Jacobs, arose directly from the personal interests of the *attorneys*, at the expense of the interests of the client.

Third, the status of an indicted lawyer is subject to potential change adverse to the client's interest, and that potential can become more dramatic as the case progresses. The government overstates the situation by suggesting that the case is in its early stages and that substitution of counsel at this point would thus cause minimal disruption. (*See* Letter to the Court from Assistant United States Attorney Daniel M. Gitner of June 3, 2004, at 1, 2, 8.) That is only technically so. Although the case is merely in the discovery stage, that lack of progress in the judicial proceedings ignores that facts that the case has been pending for over a year, that the delay is attributable to the lengthy internal bureaucratic processes applicable to capital cases, and that those processes are vital components in the defense of such cases. The defendants here have engaged in extensive investigation and are apparently progressing towards their presentation to the government. The disruptive effect of substituting counsel at this stage of the case will be significant.

Nevertheless, the potential for disruption at later and even more critical stages of the case is even greater. Amsterdam's

case too is at an early stage, and its course, in relation to the present case, is unpredictable (and certainly uncontrollable) by this Court.[9] It is extremely likely that counsel's attention and energies will be diverted by the extraordinarily intense pressures of facing the government as an indicted defendant in a criminal case. At some point, counsel will have to take time away from this matter to prepare intensely with her own counsel, and to participate in a trial of uncertain duration. Nor, despite the presumption of innocence, can the Court ignore the possibility that counsel may be convicted of a crime, and become disqualified from practicing law. The timing of such an event cannot be predicted. If a conviction does come to pass in Amsterdam's case, it will almost certainly fall at a critical stage of these proceedings, given their expected duration, especially should the death penalty be sought.

Fourth, the nature of Amsterdam's indictment implicates serious concerns about the appearance of fairness of the proceedings against Ramos. Ramos and Amsterdam argue that the kinds of interference with counsel's effectiveness discussed above are comparable to those of other personal crises affecting counsel, from pregnancy to divorce to family illness—or even the need to try other cases—that do not result in disqualification of counsel. (*See* Amsterdam Letter 6/18/04 at 9–10.) But that is not quite correct.

In the first place, such personal crises are themselves not irrelevant to an attorney's ethical obligations. A lawyer's obligation to provide independent, competent professional service to her clients is absolute, and to the extent that personal crises

make it impossible for her to perform that duty, her obligation to withdraw is clear. *See* ABA Model Code of Professional Responsibility Disciplinary Rule 2–110(B)(3). Of course, such problems rarely come to the attention of adversaries or courts, except when they have resulted in such a complete breakdown that the affected clients file grievances or malpractice suits. As counsel points out, lawyers (like other people) often need to maintain professional performance under trying personal conditions, and the experience we all have with such matters can be drawn upon in dealing with a crisis of this kind as well. But the strain of indictment is particularly great, as anyone who has represented criminal defendants knows.

Moreover, this particular crisis is highly public, and thus gives rise to questions, and to a shaking of public confidence, that would not be created by the more private personal problems cited by Amsterdam. Despite the presumption of innocence, the fact of indictment creates a unique public concern about counsel's integrity not implicated by other stressful life events. The nature of the charges against Amsterdam compounds this problem. Amsterdam is not charged with a crime committed in her personal capacity, but with misconduct in the practice of law, and specifically with taking unauthorized payments from a client assigned under the CJA, whose representation was paid for by the government. Although she remains a member of this Court's CJA panel, Amsterdam has agreed (in apparent recognition of the appearance problem created by such charges) not to take additional appoint-

---

**9.** Amsterdam submits that a "firm" trial date of November 3, 2004, has been set in her case, that the trial will last only one week, and that both sides remain "loyal" to the trial and motion schedule. (Letter to the Court from Valerie S. Amsterdam of June 28, 2004.)

Any trial judge with even a modicum of experience knows how often such trial dates need to be adjourned, despite the firmest intentions, and how unpredictable is the course of criminal litigation.

ments under the CJA pending resolution of these charges. Amsterdam is not retained counsel chosen by Ramos. She is appointed by the Court under the terms of the CJA to represent an indigent defendant. This is not to suggest that Ramos's desire to waive conflicts and retain Amsterdam's services is entitled to any less weight. But the fact of appointment heightens the Court's responsibility to assure the real and apparent fairness of the proceedings. The Court's obligation to assure that "legal proceedings appear fair to all who observe them," *Wheat*, 486 U.S. at 160, 108 S.Ct. 1692, is surely called into question when an indigent defendant is assigned a lawyer who has been indicted by a grand jury on a charge of victimizing the family of an indigent client.

That concern leads inexorably to the fifth, and most important, consideration bearing on the Court's decision. This is a potentially capital case. The government may well decide to attempt to take the defendant's life. That fact heightens every interest in the case—including, to be sure, Ramos's interest in being represented by counsel that he has come to trust, and in exercising his own autonomy in connection with matters affecting his literally most vital interests. At the same time, however, it also dramatically increases the public interest in assuring that nothing interferes with providing an indigent defendant, on trial for his life, with the most effective possible defense.

The Court need not decide whether the kinds of problems discussed above would warrant disqualification in a non-capital case. But where the Court is confronted with the potential for the ultimate penalty, it is difficult to shrug off the risks attendant on permitting a lawyer with a potential conflict of interest and a hugely distracting and highly public personal crisis to maintain primary responsibility, by Court ap-

pointment, for the defense of a man's life, at the risk of unforeseeable disruption, including the lawyer's potential conviction and consequent removal from the case. Amsterdam's continued presence in the case has already cost defendant the services of one lawyer, and created the unseemly spectacle of defense lawyers whose ability or willingness to represent their client is mediated through the advice or intervention of their own defense counsel. "The likelihood and dimensions of nascent conflicts of interests are notoriously hard to predict, even for those thoroughly familiar with criminal trials." *Wheat*, 486 U.S. at 162–63, 108 S.Ct. 1692. Whether the criminal charges against Amsterdam will at some future point require her departure as well, perhaps as the case approaches trial, cannot be predicted. These uncertainties would be much less pressing in a simpler case that could be predicted to be come to trial in the near future. Predicting the effect of a conflict arising from the interaction of two criminal cases, both likely to be unusual, hard-fought, and complicated, is all but impossible.

The potential for prejudice to the defendant is thus heightened, and rendered less tolerable, in a capital case. The capital charge also increases the importance of the *appearance* of fairness. One of the most frequently criticized aspects of the operation of the death penalty in this country is the quality of representation provided to indigent capital defendants. *See, e.g.,* Stephen B. Bright, Counsel for the Poor: the Death Sentence Not for the Worst Crime, but for the Worst Lawyer, 103 Yale L.J. 1835 (1992); American Bar Association Task Force on Death Penalty Habeas Corpus, 40 Am. Univ. L.Rev. 1 (1990); Tom Wicker, Defending the Indigent in Capital Cases, 2 Crim. Justice Ethics 2 (1983). The debate on this subject is fueled not only by careful study of trial records, appellate cases, and statistical analysis, but by vivid anecdotes that

(depending on one's point of view) either typify systemic problems or distort reality by creating memorable slogans. Either way, anecdotal accounts of condemned prisoners who were represented at trial by lawyers who were later disbarred, or who turned out to be alcoholics, or who had just graduated law school, bring the legal system into disrepute—even if, on careful examination of the record, it would turn out that one of those lawyers had performed capably in that particular case.

Should Ramos be convicted and sentenced to death, it is very unlikely that public discussion of the case will focus on Amsterdam's experience, skill and dedication, or on the fact that Ramos intelligently and with full knowledge elected to have her continue with the case. Rather, the public appearance would be that Ramos had been convicted of a capital crime when the lawyer assigned by the Court to represent him was under indictment for misconduct relating to indigent clients. Careful analysis of the precise nature of the potential conflicts and parsing of the likelihood of various events actually occurring is, under these circumstances, almost beside the point. Particularly if Amsterdam is eventually convicted of a crime, it is extremely unlikely that a reasonable citizen, hearing of the case, would believe that Ramos had received a fair trial under these circumstances.[10]

Finally, the defense argues that the Court should consider alternatives to disqualification, primarily proposing the appointment of a third attorney to join the team. (Amsterdam Letter 6/18/04 at 8–9.) This argument is unavailing. First, adding another attorney significantly increases the expense of the proceedings to the public. The defense argues that the appointment of three lawyers to handle capital cases is neither unprecedented nor unusual, and that appointment of a third lawyer might well be justified by the complexity of this case wholly apart from Amsterdam's situation. (*See* McNally Decl. 2–5.) To the extent appointment of a third lawyer is necessary for the effective defense of the case, the Court will not hesitate to provide one. But if that is required, Ramos will need, and should receive, three unconflicted lawyers, not two and a half. Second, precisely because of Ramos's professed confidence in Amsterdam, as well as because of her long familiarity with the case, it is inevitable that, if she is not disqualified, she will take the lead role in the defense. Indeed, this is already evident: despite the apparent advantages of having this motion argued by a lawyer other than the one personally involved in it, Ramos's submission on this issue was made and signed by Amsterdam alone. The presence of other lawyers will do little to mitigate the likely reality and appearance of conflict problems where the expected leader of the defense team is the lawyer with the conflict.

## CONCLUSION

The Court does not reach this conclusion happily. Giving full play to the "presumption in favor of [a defendant's] counsel of choice," *Wheat*, 486 U.S. at 164, 108 S.Ct.

---

**10.** There is not, I believe, a comparable danger of public (mis)perception of unfairness from the disqualification of Ramos's preferred attorney. First, for the reasons stated above, I believe that most lay citizens would think disqualification of an indicted lawyer is appropriate. Second, there is no danger here that the disqualification is, or will be perceived to be, the product of government manipulation—the risk that "the Government may seek to 'manufacture' a conflict in order to prevent a defendant from having a particularly able defense counsel at his side." *Wheat*, 486 U.S. at 163, 108 S.Ct. 1692. The charges against Amsterdam are clearly entirely unrelated to this case, and whether or not they ultimately prove justified, are manifestly not manufactured in order to affect the prosecution of Ramos.

1692, the Court overrides Ramos's preference with the greatest reluctance. Moreover, familiar with Amsterdam's qualities as a defender, and cognizant of the presumption of her innocence of the charges against her, the Court believes that she would pursue Ramos's defense vigorously and without conscious bias, and expresses no opinion (and has no information) about the merits of the government's case against her. Nevertheless, for all of the reasons set forth above, the Court must conclude that it is appropriate, in light of its "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them," *id.* at 160, 108 S.Ct. 1692, to grant the motion to disqualify counsel.

SO ORDERED.